### In re HOUSE OF FASHION, Inc.

### IRVING TRUST CO. v. DORFMAN et al.
### No. 400.

Circuit Court of Appeals, Second Circuit.
May 6, 1935.

David Haar, of New York City, for appellant Herman Dorfman.

Archibald Palmer, of New York City (Archibald Palmer, Sydney Basil Levy, and Harry D. Glicksman, all of New York City, of counsel), for appellant Nathan Botwin.

Benjamin Siegel, of New York City (Benjamin Siegel and Benjamin Brownstein, both of New York City, of counsel), for appellee Irving Trust Co.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. This is an appeal from an order of the District Court affirming the decision of a referee in bankruptcy. The proceeding was instituted by Irving Trust Company, as trustee in bankruptcy, for the purpose of requiring Nathan Botwin, who was the president, director, and owner of one-half of the stock of the bankrupt, House of Fashion, Inc., and Herman Dorfman, who was secretary-treasurer, director and owner of the remainder of the stock of the bankrupt, to turn over to the trustee in bankruptcy 11,979 yards of piece goods, or the sum of $5,390.55, the cash equivalent thereof, and in addition thereto the sum of $5,902.15, making a total of $11,292.70. The referee directed the respondents to turn over the above assets. We think that the order affirming the referee should be reversed as to Herman Dorfman, but should be affirmed as to Nathan Botwin.

The bankrupt was engaged in manufacturing children's dresses. On May 9, 1932, it ceased operations in its business and made an assignment for the benefit of creditors, and on May 13, 1932, an involuntary petition in bankruptcy was filed against it which resulted in an adjudication on June 18, 1932. The concealment is based on a shortage both of piece goods and cash, and the period of time involved is the last three months of the bankrupt's business, to wit, from January 31, 1932, to May 9, 1932.

The trustee sought to establish the shortage in piece goods without regard to any balance of inventory that might have existed on March 1, 1932, and confined the testimony as to shortage to such goods as were purchased between that date and May 9, 1932, when the business of the bankrupt was suspended. Such a hypothesis was, of course, favorable to the respondents because it took no account of merchandise which would naturally have been in the possession of House of Fashion, Inc., on March 1, 1932, when, and up to May 9, 1932, it was an active going concern. There were purchases of piece goods amounting to 81,293 yards within that period. Deducting from this 10,725 yards of linings purchased during the period, and goods found on hand when business was suspended, there are 70,-568 yards to be accounted for. During the period between March 1, 1932, and May 9, 1932, 19,774 yards of piece goods were sold and 11,090 dresses were manufactured. The yardage consumed in the manufacture of these dresses is the main subject of dispute.

Weitzenhoffer, an experienced pattern maker, called by the trustee to furnish an estimate of the total yardage in the 11,090 dresses, testified that dresses manufactured by the bankrupt would average 2½ yards apiece. He carefully measured six typical dresses of various sizes and based his calculations of the yardage of those particular styles. His measurements indicated yardages varying from 1 yard and 22 inches to 3 yards and 4 inches. Wiener, a cutter and pattern maker, who had been employed by the bankrupt, testified that three of the six dresses were not of the bankrupt's manufacture, but Ida Gottfield, who had for years acted as designer for the concern, testified at an examination under section

21a, Bankr. Act (11 USCA § 44 (a), that all six dresses were of its manufacture, and was unable to show that her former testimony was not correct.

Both Botwin and Wiener testified that the yardage of the bankrupt's dresses averaged considerably more than Weitzenhoffer's estimate and said that children's party dresses formed a large part of the bankrupt's output and required 5 or 6 yards of material and involved further consumption of goods through loss in cutting up. But there was no record kept by the bankrupt of material used in manufacture and the referee averaged the dresses at 3½ yards apiece.

There was no adequate answer to the proof of serious shortage furnished by Weitzenhoffer. It was based on careful measurements of typical dresses and was really met by nothing more than the testimony of Botwin, his sister-in-law and a former employee, without any documentary evidence.

The 11,090 dresses manufactured during the period in question taken at 3½ yards apiece make a total of 38,815 yards. If we take from the total of 70,568 yards, 19,774 yards of piece goods sold and 38,815 yards manufactured during the period, there remained unaccounted for 11,979 yards, the amount which the referee ordered the respondents to turn over. This shortage was valued at 45 cents per yard, which was the cost to the bankrupt of the piece goods which it had recently purchased. Upon the basis of the foregoing, we think the referee was justified in directing the return of 11,979 yards of piece goods, or the cash equivalent of $5,390.55.

To establish a cash concealment, the trustee showed that ten checks were drawn in the month of April, 1932, which were charged on the books as pay roll and aggregated $5,274.85. There was an additional check cashed by Botwin through his brother-in-law Gottfield amounting to $1,500 which was not deposited in the bank account of the concern. The amounts credited to pay roll during the period were $14,-536.50 and the checks for $7,274.85 specifically listed and attacked by the trustee were part of this sum. The sales of merchandise between January 1, and May 9, 1932, were $38,600, and the expense of labor was $14,-536.50, whereas the sales between January 1, and May 31, 1931, amounted to $82,000 and the cost of labor to $8,837.96. This extraordinary increase in the item of cost of labor was only met by statements that higher priced dresses were made in 1932 than in 1931 and that they required more expensive workmen than those formerly employed. But such an explanation does not account for almost doubling the pay roll at a time when the sales were less than half the year before. Under the circumstances we think that the referee made a liberal allowance for pay roll in 1932 when he estimated it at $9,000. That estimate left $5,536.50 in cash to be accounted for. The vouchers for the ten checks aggregating $7,274.85 have disappeared, and we are asked to believe that these drafts on the bank account, as well as the $1,500 of cash which Botwin obtained from Morris Gottfield, are accounted for in spite of lack of documentary evidence and an unwonted increase of pay roll.

While the evidence of concealment by Botwin seems clear and convincing, we are not satisfied that the measure of proof is sufficient to justify the order against Dorfman. It is true that he was an officer of the company and owned half its stock, but he testified that he was but one of three other salesmen and that his duties were confined to that branch of the business. He said that he would take out samples in the morning and be out all day, that he signed no checks for the bankrupt, that he could not read or write, and that the management of the business was left with Botwin. Botwin's testimony fully corroborated Dorfman. He said that he was in exclusive charge of the business affairs of the bankrupt, that Dorfman had nothing to do with hiring or discharging labor, or with the cost of manufacturing garments, signed no checks, and did not examine the books or records or cause them to be examined. While Botwin made use of Morris Gottfield, who was Dorfman's brother-in-law, in order to discount customers' notes and cash checks belonging to the bankrupt, and obtained, through Gottfield, $1,500 cash which has not been satisfactorily accounted for, we cannot see that the relation of Gottfield to Dorfman necessarily implicates the latter. Gottfield was the brother-in-law of Botwin, as well, and there was no proof that Dorfman had any knowledge of the transactions between the two. We are not satisfied that Dorfman had or exercised any such control over the assets of the bankrupt as to subject him to a turnover order. The proof against Botwin is clear and convincing, while that against Dorfman is tenuous and insufficient.

The order is affirmed as to Botwin and reversed as to Dorfman with directions to the District Court to dismiss the petition of the trustee so far as it relates to Dorfman.